# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| CHARLES C. FREENY III, BRYAN E. FREENY, and JAMES P. FREENY, | Case No. 2:18-cv-00049-JRG-RSP |
| Plaintiffs, | |
| v. | |
| FOSSIL GROUP, INC., | |
| Defendant. | |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................ 1

II.   BACKGROUND ............................................................................................................ 2

III.  LEGAL STANDARD ..................................................................................................... 3

    A.   Claim Construction .................................................................................................. 3

    B.   Means-Plus-Function Limitations ............................................................................ 4

IV.   AGREED CONSTRUCTIONS ...................................................................................... 4

V.    DISPUTED TERMS ....................................................................................................... 5

    A.   "request authorization code" (claim 90) .................................................................. 5

    B.   "second signal being different from the first signal" (claim 90) ............................. 8

    C.   "low power communication unit" (claims 91, 107) .................................................. 9

    D.   "the [request authorization code]" (claim 90) ....................................................... 10

    E.   "means for communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing" (claims 94, 110) .................................... 15

    F.   "means for recording the messages and data" (claim 106) ................................... 19

    G.   "means for playing back the messages and data" (claim 106) ............................... 21

    H.   Claim 90 Is Not a Mixed Apparatus and Method Claim ....................................... 23

    I.   Claim 91 Is Not Indefinite ..................................................................................... 26

VI.   CONCLUSION ............................................................................................................ 28

# TABLE OF AUTHORITIES

## Cases

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008) ............................... 11

*Biomedino LLC v. Waters Techs. Corp.*, 490 F.3d 946 (Fed. Cir. 2007) ..................................... 18

*Cheetah Omni LLC v. Alcatel-Lucent Inc.*, 939 F.Supp.2d 649 (E.D. Tex. 2013) ...................... 15

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) ................................................ 18

*Freeny v. Apple Inc.*, No. 2:13-cv-00361-WCB, 2014 WL 4294505
    (E.D. Tex. Aug. 28, 2014) ........................................................................................... 1, 8, 9

*Freeny v. Aruba Networks, Inc.*, No. 2:14-cv-01031-WCB, 2015 WL 5766265
    (E.D. Tex. Sept. 29, 2015) ..................................................................................................... 1

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367 (Fed. Cir. 2004) ...... 13

*HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270 (Fed. Cir. 2012) ........................... 24, 25

*Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-cv-00055-JRG-RSP,
    2017 WL 2190103 (E.D. Tex. May 17, 2017) ..................................................................... 23, 25

*In re Aoyama*, 656 F.3d 1293 (Fed. Cir. 2011) ...................................................................... 4, 18

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111
    (Fed. Cir. 2004) ................................................................................................................. 3, 4

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) ........................... 23

*JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324 (Fed. Cir. 2005) ......................... 4

*KJC Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351 (Fed. Cir. 2000) ...................................... 11

*Letec Corp. v. Chattem, Inc.*, No. 5:08-cv-130 DF, 2010 WL 10861324 (E.D. Tex. May 20,
    2010) ..................................................................................................................................... 8

*MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307 (Fed. Cir. 2017) .................. 23, 24

*Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367 (Fed. Cir. 2003) .................................... 7

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367
    (Fed. Cir. 2008) .................................................................................................................. 24

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) ................................................ 26

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ......................................................... 3, 4

*Traxcell Techs., LLC v. Huawei Techs. USA Inc.*, No. 2:17-cv-00042-RWS-RSP,
    2019 WL 121966 (E.D. Tex. Jan. 7, 2019) ............................................................................ 23

*UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816 (Fed. Cir. 2016) .................................. 24

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .......................................... 13

**Statutes**

35 U.S.C. § 112(f) ........................................................................................................................... 4

## I.      INTRODUCTION

Plaintiffs Charles C. Freeny III, Bryan E. Freeny, and James P. Freeny ("the Freenys") respectfully submit this brief regarding the proper construction of various disputed terms in U.S. Patent No. 6,490,443 ("the '443 patent").

The asserted claims of the '443 patent relate to a portable wireless device that can be used to establish an authorized connection to multiple other electronic devices and access functions on those other devices using different communication signals.  The '443 patent is related to U.S. Patent No. 7,110,744 ("the '744 patent"), which has been litigated in this Court before.  This Court issued two claim construction orders with respect to the '744 patent in two prior cases: *Freeny v. Apple Inc.*, No. 2:13-cv-00361-WCB, 2014 WL 4294505 (E.D. Tex. Aug. 28, 2014) ("*Freeny v. Apple*"), and *Freeny v. Aruba Networks, Inc.*, No. 2:14-cv-01031-WCB, 2015 WL 5766265 (E.D. Tex. Sept. 29, 2015) ("*Freeny v. Aruba*").  The Freenys request that the Court construe related claim terms in the '443 patent consistently with its prior claim construction orders.  Fossil does not want the prior claim construction orders to apply, but has not identified any reasonable basis for ignoring the prior constructions.

For the remainder of the disputed claim terms in the patent-in-suit, Fossil proposes constructions that are inconsistent with the '443 specification and would exclude from the scope of the claims preferred embodiments.  In addition, Fossil incorrectly argues that certain means-plus-function limitations are indefinite for lack of corresponding structure. But the specification provides ample description of exemplary structures for these limitations, as confirmed by the Freenys' technical expert.  Thus, both the intrinsic and extrinsic evidence supports the Freenys' proposed constructions.  The Court should therefore adopt the Freenys' proposed constructions of the disputed claim terms and reject Fossil's indefiniteness arguments.

## II.    BACKGROUND

The '443 patent is based on a provisional patent application originally filed on September 2, 1999 by Charles C. Freeny, Jr., the sole inventor.  (*See* '443 patent,[1] at cover page).  The Freenys are the three sons of the inventor, who died in the early 2000s.  The '443 patent, titled "Communication and Proximity Authorization Systems," relates to novel systems for enabling various electronic devices to communicate wirelessly with one another, including a novel system for activating services on multiple types of "proximity service units" through the use of a portable wireless "proximity authorization unit."  (*See id.* at 2:21-47).  At a time when companies were still trying to understand and harness the full potential of wireless telecommunications systems and public networking systems such as the Internet, Charles C. Freeny, Jr. came up with an innovative system that would allow a user to access data and/or services from a wide range of providers such as building and hotel systems, home access systems, vehicle parking and toll systems, and ATM machines using a single device communicating wirelessly over multiple signal frequencies.  (*See id.* at 2:3-47).  This highly integrated system was a vast improvement over existing wireless solutions such as cellular telephones, which at the time could provide only very limited functions and limited communications capabilities over a single communication network.  (*See id.*).

The Freenys assert that various models of Defendant Fossil Group, Inc.'s ("Fossil") smartwatches with wireless functionality infringe claims 90, 91, 94, 106, 107, 110, 122, 123, and 125 of the '443 patent.  Claim 90 is the sole independent claim in the case, and relates to a "proximity authorization unit" that can communicate wirelessly with multiples devices to access

---

[1] A copy of the '443 patent is provided as Exhibit A to this brief.

predetermined services provided through those devices using a "request authorization code."

Specifically, claim 90 recites:

> 90. A proximity authorization unit for use with proximity service units, some of the proximity service units being capable of receiving information via a first signal and some of the proximity service units being capable of receiving information via a second signal, the second signal being different from the first signal, and each of the proximity service units providing a predetermined service when activated in response to receiving a request authorization code, the proximity authorization unit comprising:
>
> a portable housing;
>
> a computer unit supported by the housing and having the request authorization code stored therein;
>
> and a communication unit supported by the housing, the computer unit retrieving the request authorization code and the communication unit outputting the request authorization code on the first signal for communication to the proximity service units capable of receiving the first signal, and the communication unit outputting the request authorization code via the second signal to the proximity service units capable of receiving the second signal.

(*Id.* at 49:36-56).

## III.   LEGAL STANDARD

### A.   Claim Construction

"[T]he claims of a patent define the invention to which the patentee is entitled the right to

exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir.

2004)).  In construing terms, courts must give each term its "ordinary and customary meaning,"

which is "the meaning that the term would have to a person of ordinary skill in the art in question

at the time of the invention." *Phillips*, 415 F.3d at 1313.  Where the meaning of a term is not

immediately apparent, courts must look at "those sources available to the public that show what a

person of skill in the art would have understood disputed claim language to mean," including

"the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314 (quoting *Innova*, 381 F.3d at 1116).

### B.   Means-Plus-Function Limitations

35 U.S.C. § 112(f) states that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  The construction of a means-plus-function limitation includes two steps: first, the Court must "determine the claimed function," and second, the Court must "identify the corresponding structure in the written description that performs that function."  *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).  A patent specification provides sufficient disclosure of structure if it "permit[s] one of ordinary skill in the art to know and understand what structure corresponds to the means limitation so that he may perceive the bounds of the invention."  *In re Aoyama*, 656 F.3d 1293, 1298 (Fed. Cir. 2011) (internal quotations omitted).

## IV.   AGREED CONSTRUCTIONS

The parties have agreed to the following constructions for the '443 patent:

| Claim Term or Phrase | Agreed Construction |
|---|---|
| Preamble of claim 90 | The preamble of claim 90 is limiting. |
| "proximity service units" (claim 90) | "devices that provide a predetermined service upon activation within a proximity" |

## V.    DISPUTED TERMS

### A.    "request authorization code" (claim 90)

| The Freenys' Proposed Construction | Fossil's Proposed Construction |
|---|---|
| "a code that authorizes access to a predetermined service" | "a code that activates a predetermined service upon receipt" |

The parties dispute the construction of the term "request authorization code" in claim 90. The Freenys' proposed construction refers to a code that "authorizes access" to a predetermined service, whereas Fossil's proposed construction refers to a code that "activates" a predetermined service "upon receipt."  The difference between these constructions is significant because the '443 specification makes a distinction between "authorization" and "activation" of a service.

As explained by the Freenys' technical expert, Dr. Dean Sirovica, authorizing access to a service is not the same as activating a service.  (*See* Sirovica Decl.,[2] ¶19).  The former refers to the act of confirming that the user should be allowed to gain access to a particular service, whereas the latter refers to actually implementing the service for the user.  (*See id.*).  The '443 specification refers to "request authorization codes" as being involved with the former process, and not the latter.

For example, the specification provides the following description of an embodiment of the proximity authorization unit for use with an ATM system:

> As another example, the proximity service unit 2920 can also be the ATM system, or the vending machine system. The ATM system or the vending machine system can be activated either automatically or manually by the proximity authorization unit 2910 when the person is within a predetermined proximity distance of the ATM system or the vending machine system. The authorization process using the request authorization code transmitted to the ATM system or the vending machine system can be activated for example at one distance for services not requiring the owner of the proximity authorization unit 2910 to physically use the menu on the

---

[2] References herein to "Sirovica Decl." refer to the Expert Declaration of Dean Sirovica Regarding Claim Construction filed concurrently with this brief.

ATM system or the vending machine system. In accordance with the present invention, if the owner of the proximity authorization unit 2910 needs to physically use the menu on the ATM system or the vending machine system, the menu operation can be enabled at a closer distance using the signal strength detected by the wireless adapter element 3180, for example. ***In the case of the ATM system and the vending machine system, the request authorization code can be transmitted to the wireless adapter element 3180 to begin the authorization process, and a physical connection between the proximity authorization unit 2910 and the physical adapter element 3170 can be used to activate the menu services***.

('443 patent, at 33:33-57) (emphasis added).  This passage describes a multi-step process where a user is first authorized to use a physical ATM when the user, carrying a proximity authorization unit, gets within a certain distance from the ATM machine, at which point the request authorization code is transmitted to the machine.  At this point, however, the ATM machine has yet to provide any services to the user.  As described in the specification, it is only after the user physically connects the proximity authorization unit to the ATM machine that the user is then able to "activate the menu services."  Thus, the specification makes a distinction between the request authorization code authorizing access to a proximity service unit and the proximity service unit actually being activated to provide services.  (*See* Sirovica Decl., ¶20).

The '443 specification also describes a similar multi-step authorization and activation process in connection with a gas pump embodiment of the invention.  (*See* '443 patent, at 33:58-34:2).  With respect to the gas pump system, the specification describes that "the authorization process using the request authorization codes transmitted to the proximity service unit 2920 can be activated for example at one distance, and the gas pump system can be activated to pump gas at a closer distance."  ('443 patent, at 33:63-34:1).  In this example, the specification again distinguishes between the request authorization code authorizing access to a proximity service unit as opposed to the services on the unit (pumping gas) actually being activated.  (*See* Sirovica Decl., ¶21).

Similarly, the specification describes the function of the request authorization code in another embodiment as follows:

> The public communication unit 50 is also provided with a proximity unit validation assembly 214 communicating with the multiple channel wireless transceiver 212.  The proximity unit validation assembly 214 receives and validates the plurality of request authorization codes received by the multiple channel wireless transceiver 212 and outputs a service authorization code in response to each of the request authorization codes upon validating the respective request authorization code.

('443 patent, at 7:66-8:7).  The language of the proximity unit validation assembly "validating" the "request authorization code" means that the proximity unit validation assembly is performing some form of analysis of the request authorization code to determine whether that code gives permission for the sender of the code to gain access to a particular resource, namely, the predetermined service.  In other words, the "request authorization code" is the code that verifies whether the sender is authorized to access the predetermined service, and does not simply activate the predetermined service. (*See* Sirovica Decl., ¶22).

This distinction in the specification between "authorization" and "activation" is why Fossil's proposed construction is incorrect.  Fossil's proposed construction incorrectly conflates the concepts of "authorizing" a user to access a service and actually "activating" that service.  As discussed, the specification makes the distinction that the "request authorization code" provides access to a proximity service unit, but does not necessarily activate the services on that unit.  Instead, activation of the services occurs through subsequent communications between the proximity authorization unit and the proximity service unit.  (*See id.* at ¶23).  Thus, the Freenys' proposed construction of "request authorization code" as "a code that authorizes access to a predetermined service" is more consistent with the specification's description of the function of the code, and should be adopted.  *See Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367,

1371 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification, of which they are a part.").

## B.  "second signal being different from the first signal" (claim 90)

| The Freenys' Proposed Construction | Fossil's Proposed Construction |
|---|---|
| "second signal transmitted through a different frequency band or protocol than the first signal" | No construction necessary |

The Freenys' proposed construction for "second signal transmitted through a different frequency band or protocol than the first signal" is consistent with the district court's prior claim construction order in the *Freeny v. Apple* case.   In *Freeny v. Apple*, one of the disputed claim terms was the phrase "different types of . . . communication signals" in claim 18 of the '744 patent.  The defendants argued that this phrase was indefinite, but the court disagreed, reasoning that:

> Similarly, the terms "frequencies" and "types of signals" are not "incomprehensible," as the defendant contends.  The meaning of the term "frequency" is not in dispute, and the specification uses the phrase "types of signals" to refer to different frequency bands, such as the Infrared band, the 900 MHz band, and the 1.8 GHz band, or different communication protocols.  See, e.g., '744 patent, col. 1, ll. 42-43; id., col. 7, ll. 47-49; id., col. 11, ll. 35-36.  In other words, the patent refers to signals that use different frequency bands or different protocols as different "types of signals." There is therefore no confusion in the way the patent uses the terms "frequencies" and "types of signals."

*See Freeny v. Apple*, 2014 WL 4294505 at *3.  In other words, the district court in *Freeny v. Apple* found that, in the context of the '744 specification (which is the same as the '443 specification), different signal types means signals using different frequency bands or protocols.

"Claim terms should generally be construed consistently across related patents."  *Letec Corp. v. Chattem, Inc.*, No. 5:08-cv-130 DF, 2010 WL 10861324, at *5 (E.D. Tex. May 20, 2010).  And because the '744 and '443 patents are related, the '443 patent claims should be construed consistently with the '744 patent claims.

The Freenys' proposed construction of "second signal transmitted through a different frequency band or protocol than the first signal" is consistent with the district court's reasoning in *Freeny v. Apple* that "different" signals means signals that use a different frequency band or protocol.  It is also consistent with how one of ordinary skill in the art would understand the phrase.  (*See* Sirovica Decl., ¶¶25-28).

Fossil argues that no construction is necessary for the phrase "second signal transmitted through a different frequency band or protocol than the first signal," but the Freenys disagree.  The Freenys' proposed construction provides clarity as to what it means for a second signal to be "different" from a first signal.

C.      **"low power communication unit" (claims 91, 107)**

| The Freenys' Proposed Construction | Fossil's Proposed Construction |
|---|---|
| "communication unit having a power for transmission of up to a maximum of several hundred feet" | No construction necessary |

The Freenys' proposed construction for "low power communication unit" is also consistent with the district court's prior claim construction order in *Freeny v. Apple*.  In that case, the court construed the term "low power communication signals" in claim 18 of the '744 patent as "communication signals having a power for transmission of up to a maximum of several hundred feet."  *See Freeny v. Apple*, 2014 WL 4294505 at *6.  Applying that construction here, the term "low power communication unit" should similarly be construed as a "communication unit having a power for transmission of up to a maximum of several hundred feet."  This is how one of ordinary skill in the art would understand the phrase.  (*See* Sirovica Decl., ¶¶30-32).

Fossil again argues that no construction is necessary for this phrase, but the Freenys disagree.  The Freenys' proposed construction provides clarity as to what it means for a communication unit to be "low power."

### D.      "the [request authorization code]" (claim 90)

| The Freenys' Proposed Construction | Fossil's Proposed Construction |
|---|---|
| No construction necessary, other than the proposed construction for "request authorization code" | "the same [request authorization code]" |

In addition to the parties' dispute as to the proper construction of "request authorization code," Fossil also seeks to separately construe the phrase "the request authorization code" in claim 90 as "the same request authorization code."  Through this proposed construction, Fossil improperly seeks to add into claim 90 a requirement for the claimed device that is unsupported by the specification.  Furthermore, Fossil's proposed construction would improperly exclude a preferred embodiment from the scope of the claim.  Indeed, Dr. Sirovica confirms that Fossil's proposed construction is at odds with the specification and the stated goal of the invention. Fossil's proposed construction should therefore be rejected.

The parties' dispute revolves around the following language in claim 90:

90. A proximity authorization unit for use with proximity service units, . . . each of the proximity service units providing a predetermined service when activated in response to receiving *a request authorization code*, the proximity authorization unit comprising: . . .

a computer unit . . . having *the request authorization code* stored therein;

and . . . the computer unit retrieving *the request authorization code* and the communication unit outputting *the request authorization code* on the first signal for communication to the proximity service units capable of receiving the first signal, and the communication unit outputting *the request authorization code* via the second signal to the proximity service units capable of receiving the second signal.

('443 patent, at 49:36-56) (emphasis added).

Fossil argues that the language referencing "the request authorization code" in claim 90 requires that the proximity authorization unit have only a single request authorization code (*i.e.*, the "same" request authorization code) that is transmitted over multiple signals to different proximity service units.  But this is an incorrect reading of the claim under basic principles of claim construction as well as in light of the specification.

The term "request authorization code" first appears in the preamble of claim 90, where it is referred to as "a request authorization code."  The indefinite article "a" in patent parlance "carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"  *KJC Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).  "That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention."  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).  And "[t]he exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'"  *Id.* (internal quotations omitted).

Since claim 90 is an open-ended "comprising" claim, the rule applies that "a request authorization code" means "one or more request authorization codes," not a single request authorization code as argued by Fossil.  In addition, all later references in claim 90 to "the request authorization code" necessarily relate back to the recited "a request authorization code." *See Baldwin*, 512 F.3d at 1342 ("The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning.").  Thus, when the claim refers to outputting "the request authorization code" on a first signal, and outputting "the request authorization code" on a second signal, that language means that any of the "one or more request authorization codes" can be

outputted on the first and second signals to satisfy the claim, and the same code need not be outputted on both signals.

Put simply, two different codes can each be "a request authorization code," each for its own proximity service unit: "the request authorization code" for the first unit and "the request authorization code" for the second. Both are request authorization codes – there is no ambiguity. Indeed, this is precisely how one of skill in the art would understand these claims. (*See* Sirovica Decl., ¶36).

Moreover, the patentee did not evince any clear intent to limit the term "a request authorization code" to only one request authorization code outputted on multiple signals. In fact, the specification shows exactly the opposite – namely, that the claim is intended to cover embodiments where multiple request authorization codes are used to communicate with different proximity service units over different signals. (*See id.* at ¶¶37-39).

First, the '443 specification states:

> The Master proximity authorization system 2900 is provided with a proximity authorization unit 2910 . . . for activating a plurality of proximity service units 2920 . . . . Some of the Proximity Service Units 2920 are capable of receiving information via a first signal and some of the proximity service units 2920 are capable of receiving information via 40 a second signal. Each of the proximity service units 2920 provide a predetermined service when activated in response to receiving ***a request authorization code***.

('443 patent, at 31:33-43) (emphasis added). Importantly, the specification here does not limit the invention to a system in which all proximity service units are activated in response to "the same" request authorization code. Rather, the specification refers to each proximity service unit being activated in response to "a" request authorization code, which does not necessarily have to be the same code for each service unit.

Furthermore, in the very next paragraph, the specification states:

> The proximity authorization unit 2910 is provided with a portable housing 2911, a computer unit 3000, and a transmitter/receiver unit 3070. The computer unit 3000 is supported by the portable housing 2911 and has *at least one and preferably a plurality of request authorization codes stored therein*. . . . The computer unit 3000 retrieves the request authorization code and the transmitter/receiver unit 3070 outputs the request authorization code on the first signal for communication to the proximity service units 2920 capable of receiving the first signal, and the transmitter/receiver unit 3070 outputs the request authorization code via the second signal to the proximity service units 2920 capable of receiving the second signal.

('443 patent, at 31:44-59) (emphasis added).  Thus, the specification imposes no limit on how many request authorization codes can be on the proximity authorization unit, and in fact recommends having "a plurality" of such codes on the device.  Other parts of the specification similarly refer to multiple request authorization codes stored on the proximity authorization unit. (*See* '443 patent, at 34:67-35:4 ("the computer unit 3000 program memory and stored *request authorization codes* and phone directories for example are maintained even when the proximity authorization unit 2910 is turned off by a control panel 3010 via line 3013."); *id.* at 33:23-28 ('the authorization process using the *request authorization codes*, such as owner codes delivered to the toll booth system from the proximity authorization unit 2910 . . . ."); *id.* at 34:23-31 ("In all of the above descriptions the authorization information that can be stored in the proximity authorization unit 2910 for delivery to the proximity service units 2920 can include credit card numbers plus PIN or special local *authorization numbers* . . . .")) (emphasis added).

"A claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'"  *Globetrotter Software, Inc. v. Elan Computer Group, Inc*., 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).  Here, Fossil's proposed construction would improperly exclude from the scope of claim 90 embodiments in the '443 specification where different request authorization

codes are used to communicate with different proximity service units.  Fossil's proposed construction is therefore incorrect.

Fossil's proposed construction requiring the use of a single request authorization code to activate all proximity service units also does not make sense in light of the specification's description of the goal of the invention.  In the Summary of the Invention, the patentee described the proximity authorization unit invention as follows:

> The present invention also relates to a master proximity signaling unit MPSU (also referred to herein as a proximity authorization unit). . . . The MPSU incorporates multiple low power type signaling capability into a low cost device specifically designed to allow all the multiple proximity services authorization devices to be incorporated into a single unit. . . .  Thus the Invention described herein allows the consumer to have a very inexpensive proximity authorization unit to replace the 10 to 20 devices and cards now required . . . . In essence the invention can replace all the cards, keys, signaling devices, and communication devices with a single unit that is lightweight and easy to carry.

('443 patent, at 2:21-47).  As discussed in this passage, a key benefit of the invention is that it is a single device that can replace the functions of multiple authorization devices to communicate with a variety of disparate systems.  Given this goal, it does not make sense that the device would utilize only a single request authorization code to gain access to multiple different systems.  Rather, since each system is likely to have a different set of authorization processes and/or communications protocols, it makes more sense for the proximity authorization unit to have multiple request authorization codes, to facilitate its ability to interoperate with different systems.  (*See* Sirovica Decl., ¶40).

Indeed, there is nothing in the '443 specification to suggest any benefit to having a proximity authorization unit that is limited to using a single request authorization code to communicate with all proximity service units.  (*See id.* at ¶41).  Instead, the specification emphasizes that the proximity authorization unit stores "preferably a plurality of request authorization codes" to facilitate communications with different types of proximity service units.

('443 patent, at 31:46-49).  Fossil's proposal to construe claim 90 as limited to proximity authorization units that use "the same" request authorization code to communicate with all proximity service units is therefore completely at odds with the '443 specification, and should be rejected.

*Cheetah Omni LLC v. Alcatel-Lucent Inc.*, 939 F.Supp.2d 649 (E.D. Tex. 2013), is instructive.  In that case, a claim directed to a light processing system included the limitation that "at least some of the mirrors are operable to undergo a partial rotation in response to the control signal."  The defendant asserted that this phrase should be construed as "two or more of the mirrors are operable to undergo a partial rotation in response to **the same** control signal."  *See id.* at 667.  Thus, the defendant in *Cheetah* made essentially the same argument as Fossil, attempting to insert the word "same" into the claim.  The court rejected this construction, reasoning that because the claim referred earlier to "a control signal" received from "a controller," the general rule that "a" means "one or more" applied, and the claimed system was therefore not limited to the use of a single control signal.  *Id.* at 667-68.

Similarly, because claim 90 refers to "a request authorization code" being received by each of the proximity service units, the claim is not limited to a proximity authorization unit that uses "the same request authorization code" when communicating with all proximity service units.  Fossil's proposed construction should therefore be rejected, and no separate construction is necessary for "the [request authorization code]."

E.    **"means for communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing" (claims 94, 110)**

| The Freenys' Proposed Construction | Fossil's Proposed Construction |
|---|---|
| This phrase should be construed under 35 U.S.C. § 112(f). | Subject to 35 U.S.C. § 112(f). |

| **Function:** Communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing<br><br>**Structure:** Visual and audio outputs such as those found on pagers, cell phones, and PDAs | **Function:** Communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing<br><br>**Structure:** Indefinite |
|---|---|

The parties agree that the phrase "means for communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing" should be construed as a means-plus-function limitation, with the function for the limitation being "communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing."   The parties, however, dispute the corresponding structure for this limitation.  The Freenys assert that the structure for this limitation should be construed as "visual and audio outputs such as those found on pagers, cell phones, and PDAs," whereas Fossil asserts that there is no corresponding structure, rendering the limitation indefinite.

Contrary to Fossil's argument, the '443 patent discloses specific structures for this limitation.  Figure 32 in the patent depicts an example user interface for the proximity authorization unit:



Figure 32

('443 patent, at Fig. 32; *see also id.* at 4:8-10).  And with respect to Figure 32, the specification

states:

> The preferred physical embodiment of the proximity authorization unit 2910 input
> and output functions is shown in FIG. 32.  The audio and display elements 3018
> have both visual output 3250 and audible output 3260 outputs such as found on
> many pagers, cell phones and PDA's.

(*Id.* at 36:61-65).  The specification therefore specifically identifies the video and data display

unit 3250 and the audio unit 3260 depicted in Figure 32 as the structure for communicating audio

and video information to the user from the proximity authorization unit.  In addition, the

specification describes these components as "outputs such as found on many pagers, cell phones

and PDA's."  The specification further recites specific types of cell phones and PDAs that were

available to the public at the time.  For example, the specification makes reference to "the Palm

Pilot VII wireless note book computer or Nokia 9000 series digital phones" as mobile devices

with exemplary "audio and video (display) functions."  (*Id.* at 9:38-45).

The Palm Pilot VII and Nokia 9000, shown below, were hand-held electronic devices available at the time of the invention in 1999:



**Palm VII**                    **Nokia 9000**

(*See* Sirovica Decl., Ex. 2 at 5; Ex. 3 at 1-1).  These devices had LCD display screens for displaying information the user and speakers for playing audio information to the user.  (*See* Sirovica Decl., ¶¶49-50).  Thus, the specification provides specific examples of structures that can be used as the "means for communicating audio and video information."

Fossil incorrectly argues that the '443 patent is indefinite as to the corresponding structure for this limitation.  A structure is sufficiently disclosed if the specification "permit[s] one of ordinary skill in the art to know and understand what structure corresponds to the means limitation so that he may perceive the bounds of the invention."  *In re Aoyama*, 656 F.3d at 1298. Thus, the focus is on how those of ordinary skill in the art would understand the specification.  In addition, "the patentee need not disclose details of structures well known in the art." *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1339-40 (Fed. Cir. 2016) (quoting *Biomedino LLC v. Waters Techs. Corp*., 490 F.3d 946, 952 (Fed. Cir. 2007)).  Here, the '443 specification explicitly

states that visual and audio "outputs such as found on many pagers, cell phones and PDA's" can

be used to perform the function of communicating audio and visual information to the user from

the proximity authorization unit.  The specification also identifies specific models of cell phones

and PDAs that have exemplary audio and video display structures.  This disclosure is sufficient

to inform those of ordinary skill in the art that the display screens and speakers available in such

devices are the structures for this means-plus-function limitation.  Indeed, Dr. Sirovica, who was

a person of at least ordinary skill in the art at the time of the invention, confirms that this is how

those skilled in the art would understand the '443 specification.  (*See* Sirovica Decl., ¶51).  Thus,

the Court should adopt the Freenys' proposed construction for this means-plus-function

limitation and reject Fossil's indefiniteness argument.

**F.     "means for recording the messages and data" (claim 106)**

| The Freenys' Proposed Construction | Fossil's Proposed Construction |
|---|---|
| This phrase should be construed under 35 U.S.C. § 112(f).<br><br>**Function:** Recording the messages and data<br><br>**Structure:** A computer memory unit | Subject to 35 U.S.C. § 112(f).<br><br>**Function:** Recording the messages and data<br><br>**Structure:** Indefinite |

Claim 106 of the '443 patent recites:

106.  The proximity authorization unit of claim 90, wherein the communication
unit is capable of receiving signals indicative of at least one of messages and data,
and wherein the proximity authorization unit further comprises means for
recording the messages and data and means for playing back the messages and
data.

('443 patent, at 50:66-51:4).

The parties agree that the phrase "means for recording the messages and data" in claim

106 should be construed as a means-plus-function limitation, with the function for the limitation

being "recording the messages and data." The parties, however, dispute the corresponding structure for this limitation. The Freenys assert that the structure for this limitation should be construed as "a computer memory unit," whereas Fossil asserts that there is no corresponding structure, rendering the limitation indefinite.

Contrary to Fossil's argument, the '443 patent provides a clear identification of the structure for this limitation. Figure 30 in the patent is a block diagram depicting an embodiment of the proximity authorization unit:



Figure 30

('443 patent, at Fig. 30; *see also id.* at 4:1-3). The specification further identifies the "computer unit" 3000 in this figure as including "program memory":

> In FIG. 30 the basic design elements incorporated into the proximity authorization unit 2910 are shown wherein there is the computer unit 3000 such as a Motorola 68000 series or TI DSP 6000 series unit or a modified Ericsson Bluetooth Baseband Processor made to operate by the power on off unit 3003 which supplies power to all the elements of the proximity authorization unit 2910 via positive lines 3004 and ground lines 3002. The power on off unit 3003 is connected to a battery and charge unit 3001 and the ***computer unit 3000 program memory*** and stored request authorization codes and phone directories for example

are maintained even when the proximity authorization unit 2910 is turned off by a control panel 3010 via line 3013.

(*Id.* at 34:59-35:4) (emphasis added).  The '443 specification also states in connection with a description of the proximity authorization unit shown in Figure 32 that "[w]hen F4 is pressed then the audio unit 3260 is connected to the computer unit 3000 memory unit and the audio being spoken or received is stored."  (*Id.* at 37:7-9).  Thus, these passages plainly describe that there is a computer memory unit within the proximity authorization unit that performs the function of storing messages and data.[3]

One of ordinary skill in the art at the time of the invention therefore would have understood from the '443 specification that the corresponding structure for the function of "recording messages and data" is a computer memory unit.  (*See* Sirovica Decl., ¶59).  The Court should therefore adopt the Freenys' proposed construction for the "means for recording the messages and data" and reject Fossil's indefiniteness argument.

### G.      "means for playing back the messages and data" (claim 106)

| The Freenys' Proposed Construction | Fossil's Proposed Construction |
|---|---|
| This phrase should be construed under 35 U.S.C. § 112(f). | Subject to 35 U.S.C. § 112(f). |
| **Function:** Playing back the messages and data | **Function:** Playing back the messages and data |
| **Structure:** Visual and audio outputs such as those found on pagers, cell phones, and PDAs | **Structure:** Indefinite |

---

[3] The specification also describes different types of computer memory that were available at the time of the invention, stating that "[t]he computer unit 220 has all of the other normal computer elements (not shown) required to operate such as RAM and permanent memory elements." ('443 patent, at 6:17-19).  The reference to "RAM" refers to random access memory, which is a standard form of computer memory commonly found in computing devices at the time of the invention.  (*See* Sirovica Decl., ¶58).

The parties agree that the limitation "means for playing back the messages and data" in claim 106 should be construed as a means-plus-function limitation, with the function for the limitation being "playing back the messages and data."  Once again, the only dispute between the parties as to this limitation is the corresponding structure.  The Freenys assert that the structure for this limitation should be construed as "visual and audio outputs such as those found on pagers, cell phones, and PDAs," whereas Fossil asserts that there is no corresponding structure, rendering the limitation indefinite.

As recited in claim 106, the "means for playing back the messages and data" serves to play back to the user the "at least one of messages and data" that is received by the communication unit.  Here, the '443 patent makes clear that the audio and visual display components shown in Figure 32 and described in the specification are the structures for the "means for playing back the messages and data."  As discussed in section V.E. above, Figure 32 depicts an example proximity authorization unit with various componentry, including audio and visual display components that the specification describes as "outputs such as found on many pagers, cell phones and PDA's."  ('443 patent, at 36:61-65).  And as discussed above, the specification also identifies example cell phones and PDAs, including the Palm VII and Nokia 9000 devices.  (*See id.* at 9:38-45).  Thus, those of ordinary skill in the art reading the specification would understand that the speakers and display screens such as those commonly found in the pagers, cell phones, and PDAs available at the time of the invention are the corresponding structure for the "means for playing back the messages and data" in claim 106. (*See* Sirovica Decl., ¶¶61-65).  Thus, the Court should adopt the Freenys' proposed construction for this means-plus-function limitation and reject Fossil's indefiniteness argument.

H.      **Claim 90 Is Not a Mixed Apparatus and Method Claim**

Claim 90 is a straightforward apparatus claim, and does not cover any method of use.

The preamble of claim 90 plainly states that the invention is directed to a "proximity

authorization unit," and the body of the claim recites various components of the unit and their

functions.  There is no language in the claim requiring a "user" to engage in any actions.  Indeed,

the word "user" does not appear anywhere in claim 90.  Thus, there is no mixed apparatus and

method claim issue here.  *See Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-cv-00055-JRG-

RSP, 2017 WL 2190103, at \*18 (E.D. Tex. May 17, 2017) (holding that claims were not

indefinite for claiming both an apparatus and method because "the claims do not recite both

structure and use of the structure *by a user*.") (emphasis in original).

Fossil incorrectly argues that claim 90 is directed to both an apparatus and a method and

therefore indefinite under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir.

2005).  In *IPXL*, the court held that a claim covering both an apparatus and a method of use of

that apparatus is indefinite because it fails to apprise those of skill in the art whether

infringement occurs when one creates the infringing device or when the user actually uses the

infringing device.  *See id.* at 1384.  Thus, the court in *IPXL* held indefinite a claim to a "system"

that included a limitation that "the user uses the input means" in a particular way.  *See id.*

Fossil apparently believes that phrases in claim 90 that describe certain claim elements

using active functional language such as "a computer unit . . . having the request authorization

code stored therein" and "the computer unit retrieving the request authorization code and the

communication unit outputting the request authorization code" transform claim 90 into a method

claim.  Fossil is wrong.  "Active functional language is properly used in apparatus claims to

denote capability of the apparatus."  *Traxcell Techs., LLC v. Huawei Techs. USA Inc.*, No. 2:17-

cv-00042-RWS-RSP, 2019 WL 121966, at \*16 (E.D. Tex. Jan. 7, 2019).  *See also MasterMine*

*Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315-16 (Fed. Cir. 2017) (finding no indefiniteness because "[t]hough claim 8 includes active verbs – presents, receives, and generates – these verbs represent permissible functional language used to describe capabilities of the 'reporting module.'").  Here, the phrases describe the functional capabilities of the recited "computer unit" and "communication unit," rather than any particular step that must be performed by the user.  This language therefore does not render the claim indefinite.

Indeed, multiple Federal Circuit cases have held that the use of active verbs in an apparatus claim does not create any *IPXL* indefiniteness issues.  In *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 827 (Fed. Cir. 2016), for example, the claim at issue recited: "An apparatus for controlling a feature on a computer generated image, the apparatus comprising: a handheld device including: an image sensor, said image sensor ***generating data*** . . ."  *Id.* at 819 (emphasis added).  The defendant in *UltimatePointer* argued, just as Fossil does here, that the use of the active verb "generating data" made it unclear whether the claim was directed to an apparatus or a method.  The Federal Circuit rejected this argument, finding no indefiniteness problem because the "generating data" limitation merely "reflects the capability of that structure rather than the activities of the user."  *Id.* at 827.

Similarly, in *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367 (Fed. Cir. 2008), the Federal Circuit found that a patent claim (claim 7) directed to a computer processor with different stages, including "performing a boolean algebraic evaluation," "producing an enable-write," later "enabling" or "disabling," and, at a different stage, "determining," was not a mixed apparatus-and-method claim, but rather an apparatus claim only.  *See id.* at 1371-72, 1375.  And in *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270 (Fed. Cir. 2012), the court found that a claim directed to a "mobile station for use with a network" that recited "storing," "holding," and other functional limitations was not indefinite.  *See id.* at 1273,

1277-78.  The court rejected the argument that the claim was a mixed apparatus and method claim, and found that the functional language in the claims "merely establish those functions as the underlying network environment in which the mobile station operates."  *Id.* at 1277.

Thus, under the Federal Circuit's decisions in *MasterMine*, *UltimatePointer*, *Microprocessor Enhancement*, and *HTC*, the use of active verbs in claim 90 to describe the functions of the "computer unit" and "communication unit" does not create any indefiniteness problems.

Fossil may also attempt to argue that the language in claim 90's preamble of "each of the proximity service units providing a predetermined service when activated in response to receiving a request authorization code" creates an indefiniteness problem under *IPXL*.  But this argument also lacks merit.  This language simply describes the network environment in which the claimed device is intended to operate – namely, the proximity service units with which the recited proximity authorization unit is designed to communicate.  (*See* Sirovica Decl., ¶67).  Such a description does not create an *IPXL* issue.  *See HTC*, 667 F.3d at 1277.

Indeed, this Court's decision in *Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-cv-00055-JRG-RSP, 2017 WL 2190103 (E.D. Tex. May 17, 2017), is directly on point on this issue.  In that case, the defendant argued that a claim directed to "[a] Mobility Management Entity (MME) . . . wherein the data forwarding tunnel identifier of the UPE is used by the LTE access network to forward data to the UPE" was indefinite because it was a mixed apparatus and method claim.  This Court disagreed, finding that the language of the "wherein" clause "does not require an action to be performed by the claimed MME structure, but instead defines the network environment in which the MME is configured to operate." *Id.* at *18.  Likewise, in the present case the claim language of the proximity service units "providing a predetermined service" does not require an action to be performed by the claimed proximity authorization unit.  Rather, the

language defines the network environment in which the proximity authorization unit is intended

to operate.  Thus, the preamble language does not render the claim indefinite.

### I.        Claim 91 Is Not Indefinite

Finally, Fossil's assertion that claim 91 of the '443 patent is indefinite lacks merit.  Claim

91 recites:

> The proximity authorization unit of claim 90, wherein the communication unit is a
> low power communication unit not two way connected to a wireless
> communication network controlled from a central control center.

('443 patent, at 49:57-60).  There is nothing indefinite about the language of this claim.

A claim is indefinite only if the claim, "read in light of the specification delineating the

patent, and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in

the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898,

901 (2014).  In addition, it is Fossil's burden to show indefiniteness by clear and convincing

evidence, and Fossil fails to meet this burden.  *See Nautilus*, 572 U.S. at 912 n.10.

To the extent Fossil argues that claim 91 is indefinite because it depends on claim 90,

which Fossil also argues is indefinite, Fossil's argument fails for the reasons already discussed in

section V.H. above.  In addition, the language in claim 91 "wherein the communication unit is a

low power communication unit" is not indefinite.  That language simply informs those of

ordinary skill in the art that the communication unit element must be a "low power

communication unit," which has the construction discussed in section V.C. above.

As for the remaining language in the claim that the communication unit is "not two way

connected to a wireless communication network controlled from a central control center," that

language also is not indefinite.  One of ordinary skill in the art would understand this to mean

that the communication unit is not using a cellular network to transmit and receive data.  As

explained by Dr. Sirovica, at the time of the invention, cell phone networks were commonly

known as wireless communication networks controlled from a central control center, the "central control center" being the operational hub of the network provider.  (*See* Sirovica Decl., ¶72). One of ordinary skill in the art would therefore understand that the claim language stating that the communication unit is "not two way connected to a wireless communication network controlled from a central control center" means that the communication unit is not communicating over a cell phone network.  (*See id.*).

The '443 specification supports this construction.  Throughout the specification, the inventor describes one advantage of the '443 invention as allowing the proximity authorization device to access services without the need for communications over a cellular network or other centrally-controlled network that requires usage fees.  In the Summary of the Invention, for example, the specification describes the proximity authorization unit (also referred to in the patent as the "MPSU") as "an alternative to having to pay for high power wireless communication devices and/or services, such as a cell phone or pager or hand held computer with wireless communication features . . . ."  ('443 patent, at 2:23-28).  The specification also describes the proximity authorization unit as a device that "can serve as an inexpensive communication device without the wireless service provider costs attached."  (*Id.* at 2:39-44).

The specification further emphasizes that the invention saves the user money because it enables wireless communications where "a commercial communication service provider, such as Air Touch Communications, Sprint or the like, is not activated and the user or customer is not charged air time."  (*Id.* at 4:41-53; *see also id.* at 39:25-28).  The specification therefore supports that "not two way connected to a wireless communication network controlled from a central control center" means that the communication unit is not communicating over a cell phone network.  (*See* Sirovica Decl., ¶¶73-74).

Thus, the language in claim 91 informs those skilled in the art about the scope of the invention with reasonable certainty.  The claim is therefore not indefinite.

## VI.   CONCLUSION

The Freenys' proposed constructions of the disputed claim terms in the '443 patent are consistent with the Court's prior claim constructions for the related '744 patent as well as the disclosures in the '443 specification.  The Freenys' proposed constructions are also supported by the expert testimony of Dr. Sirovica, a person of at least ordinary skill in the art at the time of the invention.  Fossil's proposed constructions, on the other hand, fail to account for the embodiments disclosed in the '443 specification and the structures disclosed in the specification for the means-plus-function claims.  Fossil's positions are also unsupported by any expert testimony.  Thus, both the intrinsic and extrinsic evidence support the Freenys' proposed constructions.  The Court should therefore adopt the Freenys' proposed constructions and reject Fossil's indefiniteness arguments.


Dated: January 29, 2019                    Respectfully submitted,


                                           /s/ Richard C. Lin
                                           Richard C. Lin

                                           BANYS, P.C.
                                           Christopher D. Banys     SBN: 230038 (California)
                                           Richard C. Lin           SBN: 209233 (California)
                                           Jennifer L. Gilbert      SBN: 255820 (California)
                                           1030 Duane Avenue
                                           Santa Clara, CA 95054
                                           Tel: (650) 308-8505
                                           Fax: (650) 353-2202
                                           cdb@banyspc.com
                                           rcl@banyspc.com
                                           jlg@banyspc.com

                                           LOCAL COUNSEL:

                                           TRUELOVE LAW FIRM, PLLC
                                           Kurt Truelove
                                           Texas Bar No. 24013653

100 West Houston
P.O. Box 1409
Marshall, Texas 75671
Telephone: (903) 938-8321
Facsimile: (903) 215-8510
Email: kurt@truelovelawfirm.com

**ATTORNEYS FOR PLAINTIFFS
CHARLES C. FREENY III, BRYAN E.
FREENY, AND JAMES P. FREENY**

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on January 29, 2019.  Therefore, this document was served on all counsel who are deemed to have consented to electronic service.

/s/ *Richard C. Lin*
Richard C. Lin