## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| **CHARLES C. FREENY III, BRYAN E. FREENY, and JAMES P. FREENY,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**FOSSIL GROUP, INC.,**<br><br>    **Defendant.** | **CASE NO. 2:18-cv-00049**<br><br>**PATENT CASE**<br><br>**JURY TRIAL DEMANDED** |

## FOSSIL GROUP, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.     INTRODUCTION AND BACKGROUND ....................................................................... 1

II.    LEGAL STANDARD........................................................................................................ 3

    A.    Claim Construction ................................................................................................ 3

    B.    Means-Plus-Function Claims................................................................................. 4

    C.    Indefiniteness ......................................................................................................... 4

III.   AGREED CONSTRUCTIONS ....................................................................................... 5

IV.   DISPUTED TERMS ........................................................................................................ 5

    A.    "request authorization code"................................................................................. 5

    B.    "second signal being different from the first signal" ........................................... 8

    C.    "low power communication unit".......................................................................... 9

    D.    "the [request authorization code]" ...................................................................... 10

    E.    "means for communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing" ................................. 15

    F.    "means for recording the messages and data" ..................................................... 17

    G.    "means for playing back the messages and data" ................................................ 19

    H.    Claim 90 (as a whole) ......................................................................................... 19

    I.    Claim 91 (as a whole) ......................................................................................... 26

V.    CONCLUSION............................................................................................................... 29

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alpex Computer Corp. v. Nintendo of America*,
　102 F.3d 1214 (Fed. Cir. 1996)...................................................................................3

*Cheetah Omni LLC v. Alcatel-Lucent Inc.*,
　939 F.Supp.2d 649 (E.D. Tex. 2013) (Davis, J.) ....................................................14

*Enfish, LLC v. Microsoft Corp.*,
　822 F.3d 1327 (Fed. Cir. 2016).................................................................................14

*Fenner Investments, Ltd. v. Cellco P'ship*,
　778 F.3d 1320 (Fed. Cir. 2015)...................................................................................3

*Freeny v. Apple Inc.*,
　2:13-cv-00361, 2014 WL 4294505 (E.D. Tex. Aug. 28, 2014)................................8

*Guardian Media Techs., Ltd. v. Acer Am. Corp.*,
　6:10-cv-597, 2013 WL 1866901 (E.D. Tex. May 2, 2013) (Davis, J.)...................17

*HTC Corp. v. IPCom GmbH & Co., KG*,
　667 F.3d 1270 (Fed. Cir. 2012).................................................................................25

*Huawei Techs. Co. v. T-Mobile US, Inc.*,
　2:16-cv-00055, 2017 WL 2190103 (E.D. Tex. May 17, 2017) (Payne, J.) ............25

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
　430 F.3d 1377 (Fed. Cir. 2005)...........................................................................19, 20

*Linksmart Wireless Tech., LLC v. T-Mobile USA, Inc.*,
　2:08-cv-264-DF-CE, 2010 WL 2640402 (E.D. Tex. June 30, 2010) ....................26

*Markman v. Westview Instruments, Inc.*,
　52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).......................................3

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
　344 F.3d 1205 (Fed. Cir. 2003).................................................................15, 16, 17, 18

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
　800 F.3d 1366 (Fed. Cir. 2015)............................................................................4, 12

*Medrad, Inc. v. MRI Devices Corp.*,
　401 F.3d 1313 (Fed. Cir. 2005)...................................................................................3

*Nautilus, Inc. v. BioSig Instruments, Inc.*,
　134 S. Ct. 2120 (2014)............................................................................................4, 5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
　572 U.S. 898 (2014)...................................................................................................26

*Nystrom v. TREX Co.*,
　424 F.3d 1136 (Fed. Cir. 2005)...................................................................................9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..........................................................................................3, 4, 9

*Plano Encryption Techs., LLC v. Alkami, Inc.*,
    2:16-cv-01032, Dkt. 168, 2017 WL __ (E.D. Tex. Aug. 23, 2017) (Gilstrap, J.)
    (attached as Exhibit B)....................................................................................................14

*Rembrandt Data Techs., LP v. AOL, LLC*,
    641 F.3d 1331 (Fed. Cir. 2011)......................................................................................21, 22

*TiVo, Inc. v. EchoStar Commc'ns Corp.*,
    516 F.3d 1290 (Fed. Cir. 2008)..........................................................................................13

*In re Varma*,
    816 F. 3d 1352 (Fed. Cir. 2016)....................................................................................13, 14

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).............................................................................................3

## I.     INTRODUCTION AND BACKGROUND

The '443 Patent is long, convoluted, and rife with contradictory descriptions. But, at its core, it is an attempt at presenting a very simple idea: activating multiple proximity systems such as garage doors and toll booths from a single device. The patentee desired a universal device that could, for example, wirelessly open both a garage door and activate a toll gate, without needing to use a separate, dedicated garage door opener or toll tag device.

To understand the scope of the alleged invention, it is helpful to sort out which elements the patentee did not claim to invent from those he did claim to invent. First, the existing activation devices such as for garage doors or toll booths—what the patent refers to as "legacy proximity units"—were expressly not invented by the patentee. U.S. Patent No. 6,490,443, 36:44–47 ("The legacy proximity units 3160, by themselves, are not considered part of this invention."). Instead, the patentee claimed to have invented an entire system, with new devices and accompanying process, which would interoperate on multiple, different signals to activate these kinds of services.

On one half of the invention, "proximity service units" replace, or adapt to, these legacy proximity units. These devices could receive different signals from different kinds of transmitters in order to activate services. In some embodiments, for example, these are merely adaptors that transform the conventional service units such that they could now support multiple types of signals. *Id.*, 36:55–60 ("the legacy proximity unit 3160 will also be made to operate with one or more of the proximity authorization units 2910").

For the other half of the system, the inventor replaced prior art transmitters such as door openers or toll tags—"legacy communications units"—with what he coined a "proximity authorization unit." '443 Pat., 31:29–42. These devices could transmit on different signals to activate services provided by different kinds of proximity service units. The inventor believed

(incorrectly) that such multi-signal activation devices did not exist. *Id.*, 15:46–51 ("However, prior to this invention, it is believed the systems . . . in FIGS. 9 through 17 have not been able to operate with digital wireless devices 710 that operate on different frequencies and have a communication capability other than to effect the proximity system activation function described herein.").

The activation process that takes place within this system is also simple, and one example is most clearly articulated by the Abstract. A user's proximity activation unit transmits a "request authorization code" on a signal. This is received by a proximity service unit. The proximity service unit validates the code and outputs a "service authorization code" to a legacy service unit to, for example, open a garage door.

Asserted claim 90 and its dependents are directed at one half of this system and process: the "proximity authorization device." Plaintiffs allege that Fossil infringes these claims simply because it sells devices (watches) that communicate not just on one signal but on two different signals: Bluetooth and Wi-Fi.

The problem with the asserted claims is that the inventor did not properly claim just one half of the system and method. He could not, presumably, because one would expect that simple devices that transmit on two signals rather than one already existed in the prior art, or such a claim would be so obvious that it would not be patentable. Instead, what purportedly makes the device unique is how it is used to interact with a proximity service units to activate services. Thus, there is a tension in the claims where it tries to claim just a user's proximity authorization device but at the same time tries to define the scope of that device *not* by its structure or capability, but by the *performance* of the foregoing activation process within the more complete

system. Moreover, the lack of clarity in the specification and the claims makes construing many aspects of the claims with reasonable certainty impossible.

As seen below, the asserted claims lack definiteness and cannot be construed. Where terms can be construed but the parties disagree on the scope of the claim, Plaintiffs' proposed constructions violate the laws of claim construction and should be rejected.

## II.   LEGAL STANDARD

### A.   Claim Construction

It is a "bedrock principle" of patent law that the claims of a patent define the invention. *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005). Claim terms should generally be given their "ordinary and customary meaning" in light of the patent's intrinsic record, *i.e.*, the language of the claims, the specification, and the patent's prosecution history. *Id.*, 1312, 1317. Claim terms are not construed in the abstract, but as would have been understood by a person of ordinary skill in the field of the invention after reading the intrinsic record. *Fenner Investments, Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1322-23 (Fed. Cir. 2015).

For instance, the specification is "always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Markman v. Westview Instruments, Inc*., 52 F.3d 967, 978 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) (claims are read in the context of the specification). Claims must also be construed in light of the prosecution history. *Markman*, 52 F.3d at 980. "Prosecution history is relevant not only for purposes of prosecution history estoppel but also for construing the meaning and scope of the claims." *Alpex Computer Corp. v. Nintendo of America*, 102 F.3d 1214, 1220 (Fed. Cir. 1996); *see also Medrad, Inc. v. MRI Devices Corp*., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot

look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.").

District courts may also rely on extrinsic evidence, such as dictionaries, when the intrinsic evidence does not resolve the claim construction dispute. *Phillips*, 415 F.3d at 1317. However, extrinsic evidence must always be considered in the context of the intrinsic evidence, and may be relied upon by the court only to the extent that it does not contradict the intrinsic evidence regarding the meaning of a disputed claim term. *Id.*, 1319, 1323.

## B. Means-Plus-Function Claims

Means-plus-function claim limitations, authorized by 35 U.S.C. § 112, ¶ 6, allow a patentee to draft claim terms as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof. But this flexibility in claim drafting comes at a price. Such claims are construed to cover only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof. *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (citation omitted).

## C. Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. "The claim or claims must conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description." 37 C.F.R. § 1.75(d)(1). When viewed in light of the intrinsic evidence, the claim must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. BioSig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "[The] patent must be precise enough to afford clear notice of what is

claimed, thereby 'appris[ing] the public of what is still open to them.'" *Id.* (alteration in original) (quoting *Markman*, 517 U.S. at 373). "Otherwise there would be '[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'" *Id.* (alteration in original) (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)). If the claim fails to provide such precision and certainty, the claim is invalid and indefinite. *Id.*, 2124.

Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for patent was filed. *Id.*, 2130. As it is a challenge to the validity of a patent, the failure of a claim to comply with § 112 must be shown by clear and convincing evidence. *Id.* at 2130 n.10.

## III.     AGREED CONSTRUCTIONS

The Parties have agreed to the following constructions.

| TERM | AGREED CONSTRUCTION |
|---|---|
| Preamble of claim 90 | The preamble of claim 90 is limiting. |
| "proximity service units" (claim 90) | "devices that provide a predetermined service upon activation within a proximity." |

## IV.     DISPUTED TERMS

### A.     "request authorization code"

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | FOSSIL'S PROPOSED CONSTRUCTION |
|---|---|---|
| "request authorization code" (claim 90) | "a code that authorizes access to a predetermined service" | "a code that activates a predetermined service upon receipt" |

Plaintiffs' proposed construction essentially restates the term by offering that the "authorization code" is "a code that authorizes." This is unhelpful, and contrary to the claim language. The claim is concerned with whether the code ultimately activates a service, not just

whether it is authorized. For example, the claim expressly states: "each of the proximity service units providing a predetermined service *when activated in response to receiving a request authorization code*." '443 Pat., Claim 90 (emphasis added). This claim language is consistent with the patentee's description focusing on the request/activation procedure, and not authorization:

> Each of the proximity service units 2920 provide a predetermined service when activated in response to receiving a request authorization code.

*Id.*, 31:40–42. Fossil's proposed construction thus follows directly from the claim language and the specification, and provides clarification that receipt of the request authorization code results in activation of a service.

Plaintiffs argue that "authorization" and "activation" are two separate steps, but this is a distinction without consequence for this term because, according to the claim, the request must cause activation of the service. That is, whether or not there is a distinct "authorization" step by the proximity service unit in response to receiving code is something that is not claimed. What is claimed, however, is that a request authorization code to a service unit necessarily includes a request for activation. Plaintiffs' expert, Dr. Sirovica, acknowledged that the step of activation follows after authorization:

> Q.      Would a person of ordinary skill in the art not say that, when the ATM receives that request authorization code, it is activated?
>
> A.      It depends on what is activated.
>
> Q.      Okay. And so it may authorize, it may activate, but it depends?
>
> A.      Well, it authorizes. And then what happens after that depends on the particular circumstance.
>
> Q.      Okay. In this circumstance, when did activation occur?

> A.      In this circumstance, the user of the device is authorized -- becomes authorized to use the ATM system, and *then the various services of that ATM system happen subsequently*.

Ex. A, 17:6–19 (emphasis added).

A faithful reading of the claims and specification reveals that the patentee focused only on the step of the code *activating* a service, not *merely authorizing* a service, because activation necessarily implies that authorization has occurred. The authorization may be automatic (*e.g.*, by the mere receipt of the request before activation, '443 Pat., 14:13–19) or it may be more complicated (*e.g.*, by checking an access control lists for authorized users before activation, *id.*, 22:4–11), depending upon the proximity service unit embodiment. Again, Plaintiffs' expert agreed:

> Q.      When "each of the proximity service units providing a predetermined service when activated in response to receiving a request authorization code," that means that *the proximity service unit will perform a validation step on the request authorization code before or maybe at the same time of activating the service*?
>
> A.      That is what that said, *yes*.

Ex. A, 73:19–74:1 (emphasis added).

Plaintiffs' proposed construction limits the term to only the first step of authorization, even though the claims are explicitly concerned with the second step of activation. This omits critical context that Fossil's proposed construction preserves—that the request authorization code does not merely authorize, as Plaintiffs propose, it activates a service.

**B.** **"second signal being different from the first signal"**

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | FOSSIL'S PROPOSED CONSTRUCTION |
|---|---|---|
| "second signal being different from the first signal" (claim 90) | "second signal transmitted through a different frequency band or protocol than the first signal" | No construction necessary |

This term needs no construction because its meaning is clear on its face. "Different" is the opposite of "the same," and so different signals would be easily understood by both a person of ordinary skill in the art and a jury to mean "signals that are not the same." Plaintiffs' proposal would construe "different" to apply only to certain aspects of the transmission format, which would be an improper restriction that limits the claim to only one embodiment.

In support of their argument, Plaintiffs rely on a prior construction made in *Freeny v. Apple Inc.*, 2:13-cv-00361, 2014 WL 4294505 (E.D. Tex. Aug. 28, 2014). What Plaintiffs fail to emphasize, however, is that this construction was for a materially different term:

| *Freeny v. Apple* | *Freeny v. Fossil* |
|---|---|
| "different types of . . . communication signals" | "second signal being different from the first signal" |

Unlike the term at hand, the term construed in *Freeny v. Apple* explicitly referred to the signals as being of different "types." This is significant because it denotes a classification system, which the court reflected in its construction. The term before this Court is not so limited, and so differences between the signals need not be restricted to "types" such as frequencies or protocols. The specification discloses other differences in signals, such as differences in a first and second "signal strength." '443 Pat., 13:24–29. Instead, it is sufficient that the signals be different, so adopting Plaintiffs' construction that restricts how it may be different would be improper.

Reading this term in view of the specification further counsels against adopting Plaintiffs' construction. The drafter repeatedly spoke of "frequencies" and "protocols," often in the context of signal types. *See, e.g.*, "two signal **types**, i.e. different **frequency** signal **types** or **protocols**," *id.*, 11:36–38; "same **type** infrared signal **frequency** and **protocols**," *id.*, 12:55 (emphasis added all). Had the patentee intended to limit this term to only different frequencies and protocols, he could have done so. The fact that the term was purposely phrased more broadly should be reflected in the construction. Although these examples would guide a person of ordinary skill in the art to identify when signals are "different," they need not limit the analysis.

Finally, as Plaintiffs correctly note, "the '443 patent claims should be construed consistently with the '744 patent claims. Opp. at 8; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."). The fact that the drafter chose to use distinct phrases is a declaration of his desire that the terms have distinct meanings. *See Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("When different words or phrases are used in separate claims, a difference in meaning is presumed."). The term is properly understood without construction to both a person of ordinary skill in the art and a jury, and should be given its plain an ordinary meaning.

## C.    "low power communication unit"

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | FOSSIL'S PROPOSED CONSTRUCTION |
|---|---|---|
| "low power communication unit" (claims 91, 107) | "communication unit having a power for transmission of up to a maximum of several hundred feet" | No construction necessary |

Plaintiffs do not offer any evidence as to why "low power communication unit" needs construction. Nor do they identify why it must be limited to "a maximum of several hundred feet." Adopting Plaintiffs' proposed construction would merely import a particular embodiment into the claim language when it is not required. The patent explains that a low power wireless link "does not *typically* does not communicate farther than about 300 feet." '443 Pat., 32:28–30 (emphasis added). The word "typically," however, means that this is a possible range for the signal, not a requirement. The language of the claims does not require any particular transmission range irrespective of the power involved. Instead, it is merely "low power."

The purpose of the Court's construction in the prior litigation of the '744 Patent was to reject the defendants' argument that the term is indefinite. That dispute does not arise here, and the terms are not the same. Since this term would be readily understood by one of ordinary skill in the art, the Court should reject Plaintiffs' proposal because it would improperly limit its scope.

### D.     "the [request authorization code]"

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | FOSSIL'S PROPOSED CONSTRUCTION |
|---|---|---|
| "the [request authorization code" (claim 90) | No construction necessary, other than the proposed construction for "request authorization code" | "the same [request authorization code]" |

Plaintiffs' argument on this term misses the point entirely because Fossil's proposed construction does not limit "the request authorization code" to one such code. Thus, their reliance on the presumption about plural over singular meaning of "a" is not controlling. Instead, the plain language of the claim simply requires *the same one or more* request authorization code(s) that are transmitted on a first signal are also transmitted on a second signal. There may be several request authorization codes on the claimed device, but—per the express language of

the claim—the device must have at least one code that it is capable of being transmitted on two different signals.

The term "*the* request authorization code" must therefore refer to the same "code" upon which it relies for antecedent basis—whether that "code" is one code or several. If it does not, then the claim is fatally indefinite under 35 U.S.C. § 112 ¶ 2 because the patent provides no guidance to know which of the several codes are sent on the first signal, and which of the several codes are sent on the second signal, in order for infringement to occur. Plaintiffs' expert was questioned about this scenario, where he contended that "the . . . code" must refer to a single code:

> Q: All right. So when you see "a request authorization code" in claim 90 and you understand it to be one or more request authorization codes, wouldn't it make sense, then, that "the request authorization code," when that appears in the claim, refers to the one or more request authorization codes?
>
> A: It refers to one of them, yes.
>
> Q: Just one of them?
>
> A: When it says "the," yes.

Ex. A, 35:3–12. But when pressed as to how one would know which of "the" one or more codes are sent on which signal, he conceded it would depend upon subjective opinions of engineers, rather than something intrinsic to the code or device:

> Q.      What guidelines would a person of ordinary skill in the art use to know which of the one or more request authorization codes go on which signal?
>
> MR. LIN:  Objection to form.
>
> THE WITNESS:  One needs to read the spec for that particular communications link, and the spec will say what type of code that is.

> Q.      So it would depend based upon what some engineers got together and agreed upon would be the specific request authorization code for either signal; right?
>
> A.      Yes.
>
> Q.      It would depend upon the context?
>
> A.      Yes.

Ex. A, 35:12–36:2. Thus, Plaintiffs' proposed construction—which states that "a . . . code" could

be several codes, but "the . . . code" refers to only one that is subjectively chosen—is improper.

Fossil's position that "the . . . code" refers to the same one or more codes is fully

supported by the specification. The patentee expressly states that the claimed device could have

just one code, and not necessarily several. *See* '443 Pat., 31:44–50 ("at least ***one*** . . . request

authorization code[]"). In this scenario, the same code would necessarily be sent on the two

different signals, consistent with Fossil's proposal. Furthermore, contrary to Plaintiffs'

arguments at page 14 of its brief, Plaintiffs' expert agreed that using the same one or more codes

on both signals would be compatible with the purpose of the claimed invention:

> Q.      Let's say [two different banks] both use the same [ATM] manufacturer, but they use a different communication frequency for each. In that scenario, wouldn't it be possible that the manufacturer that makes both machines used the same layered protocols and the only difference is the medium on which the signal is sent, and ***the manufacturer could use the same request authorization code for the same user; right***?
>
> A.      If the only—in that scenario, if the only difference is the frequency but the protocol is identical, then, ***yeah, that could be the same code***.
>
> Q.      And the inventor's system, the one he envisioned would still work if it were the same request authorization code, in that example?
>
> A.      In that example, at the same frequency -- different frequencies but same protocols, then ***yes***.

Ex. A, 42:14–43:6 (emphasis added). The scenario is not a surprising one—it is no different than what we typically do when we re-use the same ID number, PIN number, or password across different services. We might, for example, use the same "12345" code to activate both an ATM machine and a home security system.

Although the presumption that "a" means "one or more" is not controlling here, the cases that discuss overcoming the presumption are instructive. For example, in *TiVo* the claim required separating "an MPEG stream" into video and audio, and later "assembl[ing] said video and audio into an MPEG stream" that is sent to a decoder to be converted into TV signals. *TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008). The patentee argued that "an MPEG stream" could mean "two separate MPEG streams." *Id.* The court noted that "the question whether 'a' or 'an' is treated as singular or plural depends heavily on the context of its use." *Id.* And "[t]he general rule does not apply when the context clearly evidences that the usage is limited to the singular." *Id.* In that case, the specification describe "reassembl[ing]" two sets of components into a single stream, which indicated that the MPEG stream is restored to the same earlier state of a single stream. *Id.*, 1303–4. Thus, "an" as used in that claim referred to the same form of stream it earlier referenced, and not a different one.

Furthermore, the Federal Circuit has rejected a misreading of "a" in a similar context to what Plaintiffs argue. In *In re Varma*, the claim required "a statistical analysis request corresponding to . . . two or more selected investments." *In re Varma*, 816 F. 3d 1352, 1356 (Fed. Cir. 2016). The Court rejected a reading that two requests could satisfy "a . . . request." Although there may be many requests involved, there still must be ***at least one*** that meets all the requirements of the claims:

> But while "a" sometimes is non-restrictive as to number, permitting the presence
> of more than one of the objects following that indefinite article, context matters

even as to whether the word has that meaning. And here the question is not whether there can be more than one request in a claim-covered system: there can. Rather, the question is whether "a" can serve to negate what is required by the language following "a": a "request" (a singular term) that "correspond[s]" to "two or more selected investments." It cannot. For a dog owner to have "a dog that rolls over and fetches sticks," it does not suffice that he have two dogs, each able to perform just one of the tasks. In the present case, no matter how many requests there may be, no matter the variety of the requests the system may receive, the system must be adapted to receive a request that itself corresponds to at least two investments.

*Id.*, 1362-63 (citation and footnote omitted); *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1342 (Fed. Cir. 2016) (regarding "a logical table," finding that the limitations at issue were required to be "in the same logical table"); *Plano Encryption Techs., LLC v. Alkami, Inc.*, 2:16-cv-01032, Dkt. 168 at 18, 2017 WL __ (E.D. Tex. Aug. 23, 2017) (Gilstrap, J.) (discussing cases) (attached as Exhibit B).

Finally, Plaintiff's reliance on *Cheetah Omni LLC v. Alcatel-Lucent Inc.*, 939 F.Supp.2d 649 (E.D. Tex. 2013) (Davis, J.) is misplaced. There, the concern was not over the term referring to the "same" signal in the manner Fossil contends, but over whether the original signal remained "undivided"—i.e., unaltered or not attenuated. *Id.*, 660–661 ("Defendants' construction merely restates the Claim language and adds the word 'undivided' to it."). Fossil's proposed construction here does not turn on whether the code or codes are immaterially modified as they are transmitted on each signal. A person of ordinary skill in the art would be able to understand whether two "request authorization codes" are the same.

In sum, Plaintiffs' own expert concedes that the claimed device is capable of transmitting the same code on each signal. Furthermore, his suggestion that "the . . . code" could refer to different things for each signal in the claim is not required anywhere in the specification and would render the term ambiguous. The claim's limitations plainly require that "the . . . code" that

is stored is sent on both signals. There must be at least one such code. Within that framework, there is no support for "the [request authorization code]" to be read as anything other than "the same [request authorization code]."

E.  **"means for communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing"**

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | FOSSIL'S PROPOSED CONSTRUCTION |
|---|---|---|
| "means for communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing" (claims 94, 110) | This phrase should be construed under 35 U.S.C. § 112(f). **Function**: Communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing. **Structure**: Visual and audio outputs such as those found on pagers, cell phones, and PDAs. | Subject to 35 U.S.C. § 112(f). **Function**: Communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing. **Structure**: *Indefinite*. |

The problem with this term is that the patentee did not tell the public what in particular he intended to claim about "pagers, cell phones, and PDAs." This type of functional claiming is not permitted. *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid that price but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification."). That is a wide range of devices, and the specification has no guidance that gives reasonable certainty for what is about their structure that the patentee intended to claim.

For example, Plaintiffs' expert suggested that, for a PDA, "a black-and-white high-resolution display where you have pixels that can depict visual video and picture information"

could be the claimed structure. Ex. B, 46. But for cell phones, "it depends upon the type of cell phone." *Id.* And worse, for pagers, "the simpler pagers could only display character information, like text" and not video. *Id.*, 47. That is, according to Plaintiffs' expert, pagers could not display the "video" required by the claim but could display text. *Id.*

Despite its expert's admission that pagers typically could not present video and he was aware of none that did, Plaintiffs presented no evidence of any pagers at the time that supported video. Without this evidence, Plaintiffs cannot demonstrate that a person of ordinary skill in the art would understand with reasonable certainty the scope what the patentee meant when he identified that pagers had the requisite structure to perform the claimed function. Clearly, it includes high-resolution, high-frame-rate displays like those in PDAs, but what about on the low end? What was the patentee referring to?

As a hedge against the ambiguous structure pointed to by the specification, Plaintiffs cite to examples of particular devices in the specification. However, those examples are from a section of the specification far removed from the relevant discussion of the claimed proximity authorization unit. Specifically, the Palm Pilot VII and Nokia 9000 are referred to in column 9 in the context of a "Pico Pay System." '443 Pat., 9:32–45. Conversely, the section that discusses the at-issue "Master Proximity Authorization System" begins 22 columns later and never mentions these devices. This distant disclosure of specific devices cannot support the claimed function because "structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Med. Instrumentation*, 344 F.3d at 1210 (internal citation and quotation omitted). Moreover, no examples of pagers were identified.

In addition, the fact that the specification discloses the suitability of a structure for one function does not create a basis for that structure to support any function. *See, e.g.*, *Guardian Media Techs., Ltd. v. Acer Am. Corp.*, 6:10-cv-597, 2013 WL 1866901, at *13 (E.D. Tex. May 2, 2013) (rejecting a patentee's attempt to broaden structure to include an unrelated disclosure) (Davis, J.). If the patentee had intended for these devices to provide the structure for the claimed function, it was his duty to provide a clear link or association, for such is the "quid pro quo for allowing the patentee to express the claim in terms of function under section 112, paragraph 6." *Med. Instrumentation*, 344 F.3d at 1211.

Finally, even if a person of ordinary skill would have known to use this structure, that is not the standard. The relevant inquiry is whether such a person "would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure." *See id.*, 1212. This is important because it is the patentee's burden to particularly point out and distinctly claim the invention. 35 U.S.C. § 112 ¶ 2. The reader should not be required to make their own inventive step in order to divine the meets and bounds of the invention. The term is therefore indefinite.

### F.    "means for recording the messages and data"

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | FOSSIL'S PROPOSED CONSTRUCTION |
|---|---|---|
| "means for recording the messages and data" (claim 106) | This phrase should be construed under 35 U.S.C. § 112(f).<br><br>**Function**: Recording messages and data.<br><br>**Structure**: A computer memory unit. | Subject to 35 U.S.C. § 112(f).<br><br>**Function**: Recording the messages and data.<br><br>**Structure**: *Indefinite*. |

The structure proffered by Plaintiffs for this term suffers from the same defect as discussed above—it is excessively broad, vague, and circularly defined. "A computer memory unit" could reasonably encompass numerous types of digital recording technology, many of which would find no support in the specification. For instance, "a computer memory unit" could describe read-only memory (ROM); random-access memory (RAM); it variants dynamic random-access memory (DRAM), static random-access memory (SRAM), or non-volatile random-access memory (NVRAM); or a multitude of other formats. Instead of limiting the term to the performance of the function on a specific structure, Plaintiffs' proposed structure inflates the scope of the term to coincide with the performance of the function on any structure. *See Med. Instrumentation*, 344 F.3d at 1211. In essence, Plaintiffs' proposal is that the function of recording messages and data can be performed by any structure capable of recording messages and data.

The '443 Patent simply does not provide the specificity of structure that § 112 ¶ 6 demands. To the contrary, the specification itself is confused as to what performs the recording function. For example, at one point the specification refers to a "computer unit 3000 program memory" ('443 Pat., 34:67–35:1), but later discusses "the computer unit 3000 memory unit" (*id.*, 37:8–9). Aside from these conflicting definitions, there is nothing more to suggest what specific structure performs the claimed function. If the patent cannot clearly define the underlying structure, then a person of ordinary skill cannot either. This term is indefinite.

### G.    "means for playing back the messages and data"

| Term | Plaintiffs' Proposed Construction | Fossil's Proposed Construction |
|---|---|---|
| "means for playing back the messages and data" (claim 106) | This phrase should be construed under 35 U.S.C. § 112(f). **Function**: Playing back messages and data. **Structure**: Visual and audio outputs such as those found on pagers, cell phones, and PDAs. | Subject to 35 U.S.C. § 112(f). **Function**: Playing back the messages and data. **Structure**: *Indefinite*. |

Plaintiffs offer the same structure and same arguments for this term as they did for the term "means for communicating audio and video information in a format perceivable by an individual located adjacent to the portable housing." Therefore, this term is also indefinite as explained above.

### H.    Claim 90 (as a whole)

| Term | Plaintiffs' Proposed Construction | Fossil's Proposed Construction |
|---|---|---|
| claim 90 (as a whole) | Claim 90 as a whole is not indefinite because it is not directed to both an apparatus and a method. | Claim 90 as a whole is indefinite because it is directed to both an apparatus and a method. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). |

Claim 90 as a whole is indefinite because, as Plaintiffs' own expert concedes, it claims an apparatus that is defined by the performance of steps related to activation and/or authorization of a service. That is, infringement would turn upon the user using the claimed device in a particular environment in a certain way, rather than the intrinsic capabilities of the claimed device alone.

Thus, under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005),

Claim 90 is indefinite because it claims both an apparatus and a method of use.

To begin, Plaintiffs agree that the preamble of Claim 90 is limiting. The preamble

requires infringement by a method step performed by an unclaimed proximity service unit in

response to receiving a request authorization code:

> A proximity authorization unit for use with proximity service units, some of the
> proximity service units being capable of receiving information via a first signal
> and some of the proximity service units being capable of receiving information
> via a second signal, the second signal being different from the first signal, and
> ***each of the proximity service units providing*** a predetermined service when
> activated in response to receiving a request authorization code….

'443 Pat., Claim 90 (emphasis added). As seen in the emphasized portion, the parties ***agree*** that

infringement of Claim 90 requires a step of unclaimed devices—the proximity service units—

providing a predetermined service when activated in response to receiving a request

authorization code from the claimed device.

Furthermore, the claim requires its proximity authorization unit to perform at least on

step of retrieving and two steps of outputting request authorization codes:

> ***the computer unit retrieving*** the request authorization code and ***the
> communication unit outputting*** the request authorization code on the first signal
> for communication to the proximity service units capable of receiving the first
> signal, and ***the communication unit outputting*** the request authorization code via
> the second signal to the proximity service units capable of receiving the second
> signal.

*Id.* (emphasis added). Thus, on its face, Claim 90 is indefinite under *IPXL* for claiming an

apparatus and method steps.

Plaintiff provides three arguments in response: (1) that the claim does not explicitly

require a "user" performing a step; (2) that the claim recites only capabilities of the apparatus,

not steps; and (3) that the claim recites only the intended environment. Each of these arguments fails.

First, Plaintiffs' argument concerning the absence of the word "user" is a red herring. The Federal Circuit has never held it necessary that a claim employ the word "user" before it may be ruled invalid for mixing claim types. Indeed, the Federal Circuit has previously found indefiniteness for claim type mixing without requiring a "user." In *Rembrandt Data*, the Federal Circuit found that a claim was indefinite because it recited an apparatus—a "data transmitting device for transmitting"—comprising several features, but with a final step of "transmitting" the data. *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011).

Second, the limitations highlighted above are not mere capabilities. Claim 90 shows that the patentee knew when to use, and when to deviate from, the phrase "capable of."

> A proximity authorization unit for use with proximity service units, some of the proximity service units being ***capable of*** receiving information via a first signal and some of the proximity service units being ***capable of*** receiving information via a second signal, the second signal being different from the first signal, and each of the proximity service units ***providing*** a predetermined service when activated in response to receiving a request authorization code, the proximity authorization unit comprising:
>
>      …
>
> the computer unit ***retrieving*** the request authorization code and the communication unit ***outputting*** the request authorization code on the first signal for communication to the proximity service units ***capable of*** receiving the first signal, and the communication unit ***outputting*** the request authorization code via the second signal to the proximity service units ***capable of*** receiving the second signal.

'443 Pat., Claim 90 (emphasis added). Perhaps the inventor wanted to claim only the capabilities of the proximity authorization unit, such that the claim could be valid. Perhaps he did not. But it is too late to correct the claim for a mistake that is not clearly a typographical error. The Federal

Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Rembrandt*, 641 F.3d at 1339 (quoting *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004)).

Finally, the method steps in the claim do not reflect merely the environment in which the apparatus is intended to be used. To the contrary, it is clear from the claim language—and Plaintiffs' expert's own admissions—that the patentee defined the claimed apparatus by it being used in a multi-step, multi-device process of sending a request, receiving the request, authorizing the request, and activating a service in response. The claim for a device has a limitation that requires something else—"proximity service units"—to perform a step of "providing a predetermined service when activated in response to receiving a request authorization code" in order for there to be infringement.

The parties' arguments over "request authorization code" highlight that the claim requires a performance of a step by the proximity service unit. Although both parties disagree about the meaning of this term, they both agree that it is a code that "authorizes" or that "activates" "a predetermined service upon receipt" by a proximity service unit. The parties agree that there is nothing intrinsic to the code—such as the number 12345—that would identify whether it is a request authorization code or not. Instead, it is the how the code is ***used*** by the proximity service unit upon receipt that would tell one whether or not it is a request authorization code. In short, Fossil would not know if it made a device that infringed unless it was used in an environment in which it and other devices performed the steps recited in the claims.

During his deposition, Plaintiffs' expert admitted that the code itself is not defined by what it is within the claimed device, but rather how it is used within in a broader communications system:

Q.      So just looking at the number 12345, then, I wouldn't know whether that's a request authorization code or not?

A.      You mean if you saw 12345 within somewhere?

Q.      Right.

A.      **_You wouldn't know without knowing the specification of the system._**

Ex. A, 21:14–20 (emphasis added). The "specification of the system" that Plaintiffs' expert was referring to is an arbitrary, subjective agreement of a group of engineers to decide that a particular code sent by the claimed device will be used by a proximity service unit to authenticate (or activate) a service:

Q.      How would a person of ordinary skill in the art know if 12345 is a request authorization code?

MR. LIN: Objection to form.

THE WITNESS: Typically, one reads the spec of the system and the spec will define all these things.

BY MR. CONRAD:

Q.      Okay. What spec are you talking about?

A.      So whenever engineers build a system, they typically build it based on some specification, some requirements/specifications. And then when they build it, they would then write their own detailed spec of how this thing works.

Q.      Okay. So someone could—so is it the specification that defines what would be a request authorization code?

A.      One would find it in the specification, yeah.

Ex. A, 20:2–19.

Plaintiffs' expert's reliance on how the device is used and the steps that are performed in order to define infringement is highlighted by Plaintiffs' disagreement over whether a "request authorization code" must "authorize" or whether, as Fossil argues, it "activates." It matters,

apparently, because "an engineer or engineers [could] have written and said '12345, in this instance, is going to be an authorization code'" as opposed to something else. *See* Ex A., 22; *see also id.*, 27–29 (questioning whether or not "12345" is a request authorization code in the context of an ATM machine based upon an arbitrary specification); *id.*, 28:25–29:10 ("Q. But sitting here today, knowing that 12345 is contained within computer unit 3000, you're not going to know whether or not it's a request authorization code based on what we have here; right? A: That is correct.").

What Plaintiffs' expert's testimony demonstrates is that Claim 90 is not a mere apparatus claim, but is one directed to a process with multiple steps taking place within a system of several components: a proximity authorization device sending a request authorization code, a proximity service unit authorizing the service based on the code, and ultimately activating service by a legacy activation device. He explained:

> Q.      What steps does the proximity authorization unit of Claim 90 take to do authorization as opposed to activation?
>
> A.      The first step is it detects that it's in proximity to the other device.
>
> Q.      ***And where do you see that in Claim 90***?
> . . .
> A.      So in the preamble, it says "each of the proximity service units ***providing a predetermined service*** when activated in response to receiving a request authorization code." ***So that's when that authorization step begins to happen***. And in the specification somewhere—I don't know precisely where—it says that happens upon the detection of proximity.

Ex. A, 13:3–18 (emphasis added). Dr. Sirovica's observation is not any isolated one. He clearly understood the ***entire*** Claim 90 to be directed to performing a method, despite it being an apparatus claim:

> Q: Okay. What part of Claim 90 is performing the authorization?

          MR. LIN: Objection to form.

          THE WITNESS: I would say, ***collectively***, it's performing authorization. It's about performing authorizations.

Ex. A, 12:17–22 (emphasis added).

          Plaintiffs' reliance on *HTC* and *Huawei* is distinguishable. In both of those cases, the questionable claim language was construed to not be a claim limitation. That is, it was clear that when the claimed device was made or sold that it would infringe. For example, in *HTC*, the Court concluded that the claimed "mobile station" did not perform the steps recited in the claim. Thus, it was clear that the "mobile station" would infringe when made or sold. *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1274 (Fed. Cir. 2012). Similarly, in *Huawei*, claims for an SGSN or MME device contained "wherein" clauses that this Court concluded were not a limitation of the claim. *See Huawei Techs. Co. v. T-Mobile US, Inc.*, 2:16-cv-00055, 2017 WL 2190103 (E.D. Tex. May 17, 2017) (Payne, J.). Unlike those cases, the parties agree here that limitations of the claim are defined by the performance of method steps, namely the "request authorization code" activating (or authorizing) a service by proximity service units. That is, it is not clear whether Fossil would infringe if it made a device containing the code "12345," even if the device were capable of transmitting that code on different signals. Infringement would only become apparent if it were used in an environment in which the device transmitted the code and we learned whether or not the code was a "request authorization code" because, upon receipt by the proximity service unit, activated a service.

I.     **Claim 91 (as a whole)**

| TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | FOSSIL'S PROPOSED CONSTRUCTION |
|---|---|---|
| Claim 91 (as a whole) | Not indefinite.<br><br>The term "low power communication unit" has a definite construction, set forth above.<br><br>Also, the phrase ". . . not two way connected to a wireless communication network controlled from a central control center" has a definite meaning that the communication unit is not communicating over a cell phone network. | *Indefinite.* |

Claim 91 recites:

91. The proximity authorization unit of claim 90, wherein the communication unit is a low power communication unit not two way connected to a wireless communication network controlled from a central control center.

The claim is indefinite because it is unclear what is "controlled from a central control center." One possible interpretation is that it is the "wireless communication network" that is "controlled from a central control center." Alternatively, it may be the "communication unit" that is "controlled from a central control center" while also being "not two way connected to a wireless communication network." Each reading is grammatically possible, but unfortunately the '443 Patent's specification provides no further clarity as to which was intended. There is no disclosure of the phrase as a whole nor its constituent parts. When variations on "two way connected," "low power," "wireless," "communication network," and "central control center" independently appear in the specification, the discussions surrounding them do not appear directed at this phrase and provides no insight. This ambiguity renders the claim indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 908 (2014); *Linksmart Wireless Tech.,*

*LLC v. T-Mobile USA, Inc.*, 2:08-cv-264-DF-CE, 2010 WL 2640402, at *11 (E.D. Tex. June 30, 2010) (finding the term "location the user access" indefinite because it was grammatically incorrect could be interpreted in various ways).

Plaintiffs assert that it must be the "wireless communication network" that is "controlled from a central control center," but they do not show where the specification expressly explains or requires this. They merely point out that one of the many goals of the invention was to avoid cellular fees, and then leap right to the conclusion that "two way connected to a wireless communication network controlled from a central control center" must therefore mean only a cell phone network. *See* Opp., 27. However, this express connection between a cell phone network, "two way," and a "central control center" is nowhere to be found in the specification because the patent never mentions a "central control center" at all, let alone one that controls a cell phone network. Thus, even if the claim means that the "wireless communication network" is being controlled, it is not limited to cell phone networks. Therefore, Plaintiffs' proposed construction should be rejected outright.

The only discussion of a "control center," in general, is more closely aligned with an alternative meaning: that it is not the *wireless network* controlled by the central control center but it is the *claimed device and its communications with the proximity service unit*. The patent discloses various examples of one-way automatic wireless service activation, which it distinguishes from various examples involving a more complicated two-way wireless activation procedure.

For example, "two way" appears in the specifications most prominently at 14:11–12. ("two way communication capability is always assumed to be unavailable"). There, the specification emphasizes a preferred embodiment of proximity authorization units that can

activate a service by one-way transmission only, simply by coming into range with a proximity

service unit. '443 Pat., 14:13–15 ("[a]utomatically activated when reaching a predetermined

proximity distance").

But the specification also describes "more expensive" two-way wireless communication

models and two-way activation procedures. *Id.*, 21:62. In several embodiments with two-way

communication, authorization codes may be centrally generated and transmitted from the

proximity service unit back to the proximity authorization unit to implement more complicated

authorization/activation procedures. "A two way system for example might be connected to the

home security system that might be connected to and Internet service provider that keeps a list of

all the authorized codes." *Id.*, 22:4–7. For example, the disclosed embodiment describes the

proximity service unit having link to a "control or billing center 2950." *Id.*, 32:31–34; Fig. 29.

On exemplary embodiment involves the validation of encrypted biometric data. '443 Pat.,

40:19–38. The specification explains that the "access control center" is a location where a

"master biometrics data base" is stored:

> In the manner described both the proximity service unit 2910 and the proximity
> authorization unit 2920 receive SPIN numbers that use the control centers private
> key to generate messages involving the ***master biometrics database stored at the
> access control center***.

*Id.*, 40:28–33 (emphasis added). In this embodiment, the communication is two way—

transmission of request authorization codes and receipt of unique SPIN numbers from the central

control center—that control the generation of messages on the device.

Another two-way embodiment describes "a two way manual activation signal system is

incorporated into wireless transceiver units" such as parking meters. *Id.*, 20:24–25. Here, the

proximity authorization unit 710 would request the parking meter to be activated. *Id.*, 20:30. The

service unit would then ask for the customer ID, SPIN code, or other information "back to the

wireless device." This information would "be used to authorize and eventually charge the customers account." *Id.*, 20:35–36. Alternatively, the system may already have stored with a "predetermined set of SPIN codes for which the meter service was authorized." *Id.*, 20:39–40.

Thus, the specification's description of one-way automatic service activation (as opposed to two-way wireless service activation) is at odds with Plaintiffs' argument that the claim refers to the "central control center" being the "operational hub of the network provider." Opp., 27. Both are grammatically correct interpretations of the claim. Furthermore, Plaintiff argues that the specification supports just one grammatical reading. As seen above, another grammatical reading is also supported by the written description. Because of the ambiguous grammar, the claim has two possible interpretations. The '443 Patent provides no guidance requiring either interpretation to give it meaning with reasonable certainty to a person of ordinary skill in the art, so this term is indefinite. But whether or not the claim is indefinite, the Court should reject Plaintiffs' proposed construction because it improperly restricts the meaning of "wireless communication network" to cell phone networks.

## V.    CONCLUSION

For the foregoing reasons, Fossil respectfully requests that the Court reject Plaintiffs' proposals, adopt Fossil's proposed constructions, and find the '443 Patent indefinite.

Dated: February 12, 2019

Respectfully submitted,

**FISH & RICHARDSON P.C.**

By: */s/ David B. Conrad*
    Neil J. McNabnay
    mcnabnay@fr.com
    Texas Bar No. 24002583
    David B. Conrad
    conrad@fr.com
    Texas Bar No. 24049042
    Michael A. Vincent
    vincent@fr.com
    Texas Bar No. 24105738
    1717 Main Street, Suite 5000
    Dallas, Texas  75201
    (214) 747-5070 - Telephone
    (214) 747-2091 - Facsimile

**COUNSEL FOR DEFENDANT
FOSSIL GROUP, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on February 12, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(c).

*/s/ Michael A. Vincent*
Michael A. Vincent